IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
January 28, 2020 Session

**STATE OF TENNESSEE V BENJAMIN SCOTT BREWER**

**Appeal from the Criminal Court for Hamilton County**
**No. 295881    Don W. Poole, Judge**

_____

**No. E2019-00355-CCA-R3-CD**

_____

Benjamin Scott Brewer, Defendant, was convicted after a jury trial of six counts of vehicular homicide by intoxication, four counts of reckless aggravated assault, driving under the influence, violation of motor carrier regulations, and speeding.  As a result, Defendant was sentenced to an effective sentence of 55 years in incarceration.  Defendant appeals his convictions and sentences, arguing on appeal that the State violated *Brady v. Maryland*, 373 U.S. 83, 87 (1963); that the trial court improperly certified a witness as a drug recognition expert; that the evidence was insufficient to show intoxication; and that the trial court improperly sentenced Defendant to consecutive sentences.  Following our review, the judgments of the trial court are affirmed.

 **Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

TIMOTHY L. EASTER, J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER and ROBERT H. MONTGOMERY, JR., JJ., joined.

Raymond T. Faller, District Public Defender; Mike A. Little, Jay Underwood, and Erinn Rene O'Leary, Assistant District Public Defenders, for the appellant, Benjamin Scott Brewer.

Herbert H. Slatery III, Attorney General and Reporter; Jeffrey D. Zentner, Assistant Attorney General; Neal Pinkston, District Attorney General; and Crystle Carrion, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

At approximately 7:09 p.m. on June 25, 2015, Defendant was driving a Peterbilt semi-truck on I-75 in a construction zone near Chattanooga when he crashed into multiple cars from the rear. The semi-truck's speed was approximately seventy-eight to eighty-two miles per hour. The entire crash scene was 453 feet long. As a result of the horrific crash, six people were killed and four people were injured. Defendant was indicted by the Hamilton County Grand Jury for six counts of vehicular homicide by intoxication, four counts of reckless aggravated assault, driving under the influence, violation of motor carrier regulations,[1] and speeding.

On the day of the crash, Curtis Caulder, a commercial driver for Old Dominion Freightliners, was driving his personal vehicle on I-75 from Atlanta toward Chattanooga when he saw Defendant driving in his "big pretty purple Peterbilt." Mr. Caulder described Defendant's driving as "reckless" and noted that he was "speeding." Mr. Caulder followed Defendant and "tried to catch him" so that he could "call his company and let them know how he was driving." Mr. Caulder saw Defendant "tailgating people and driving way over the posted speed limit." Mr. Caulder estimated that Defendant was driving "way over 80 [miles per hour]" and did not see Defendant use his brakes before hitting multiple vehicles that were either slowed or stopped in the construction zone. Mr. Caulder witnessed what he described as "the worst crash scene [he had] ever seen in [his] whole life." He saw one car "blow up." One of the cars "attached to [Defendant's] front bumper and went past the crash scene probably 400 feet or so past where he hit the first vehicle." Mr. Caulder pulled off the exit closest to the crash site, called 911, and tried to help some of the injured people. He was afraid for his own life because there were cars on fire and fluid on the roadway.

Tina Marie Close, her husband, and their two children were traveling in their truck near mile marker eleven on I-75 on the day of the crash. The family was on the first leg of their summer vacation when the navigation system gave them a warning about slowing traffic ahead. One of their children was asleep in the back seat and the other child was watching a movie while wearing headphones. There was a road sign notifying drivers of a left lane closure for construction. Mr. Close moved their vehicle to the center lane and continued to advance in traffic until he was eventually forced to stop because of the construction.

---

[1] Defendant filed a motion to sever this count from the remaining counts at trial. The trial court granted the motion.

2

Mrs. Close heard "an explosion or implosion" and turned to look out the rear window of their truck in the direction from which the noise originated. She saw Defendant's semi-truck coming toward them "very fast, it was not appearing to slow down" and she saw cars "going everywhere." Mrs. Close yelled to warn her husband because she was afraid that they were about to be killed. Their truck was hit from the rear by Defendant's semi-truck; the impact destroyed their truck bed. All four members of the family were able to get out of the vehicle. They saw a "group of vehicles behind [them] on fire." Mr. and Mrs. Close were both treated for whiplash as well as other injuries. The experience was so traumatic that Mr. and Mrs. Close received counseling after the wreck.

Nancy Stanley was riding in a 2007 Chevy Uplander van with her husband, John Stanley, on I-75 on the day of the crash. They were headed to Gatlinburg when they saw signs announcing that there was construction ahead on the roadway. Traffic was moving at a "creepy crawl" pace. Mr. Stanley saw the construction zone and the slowing traffic from the "top of a hill." When they reached the "zone," traffic was just about at a "complete stop." He "heard a racket" and looked in the mirror on the left door of his van and saw cars coming toward them. He told Mrs. Stanley that they were about to be hit. Their van was hit "so hard it broke the seats and [they] both fell back." Mr. Stanley saw fire and told Mrs. Stanley to get out of the van. They were both injured – Mrs. Stanley sustained bruising on her right side and has a permanent knot on her side, and Mr. Stanley received an injury to his lower back, his shins, and bruising on his lower extremities. He still felt pain in his legs a year after the crash.

Ryan Humphries also received injuries in the crash. He was driving his Ford F-150 truck on I-75 when he noticed overhead signs announcing construction. Mr. Humphries also saw construction trucks and saw that traffic was "getting backed up because of construction." Mr. Humphries did not recall the actual crash; his first memory after the crash is in an ambulance. Mr. Humphries sustained a cut on the back of his head that needed a total of six to ten staples. He also suffered from a shattered elbow and detached bicep from the crash. It took almost a year to regain the use of his arm. Mr. Humphries had surgery to insert pins and a rod into his arm. Additionally, he sustained severe burns on his heel that necessitated a double skin graft. It took nearly two years for him to regain the ability to walk normally.

Justin Knox, the driver of a Cadillac CTS-V, was driving from Atlanta to Knoxville when his car was hit during the crash. He did not recall the accident. He woke up in the hospital. As a result of the crash, he suffered a brain bleed and a severe concussion. It took him several months to regain his memory and start functioning

normally. At the time of trial, Mr. Knox still had difficulty doing his job and had anxiety when he drove.

Robert Delay witnessed the accident. He was driving home on I-75 when he saw traffic slow because of construction. He looked behind his vehicle and could see Defendant driving his truck in the left lane, where cars were slowed because of the construction. Mr. Delay opined that Defendant could have moved his truck over to the right to avoid hitting cars but Defendant did not do so. Mr. Delay did not see Defendant hit the brakes prior to the crash and estimated that Defendant's truck was traveling approximately seventy miles per hour when it struck the first car. Mr. Delay could see cars "going everywhere." Mr. Delay saw Tiffany Watts get ejected from her car; her body landed in front of his truck. Mr. Delay got out of his car to check on Ms. Watts but she was already deceased. Another car, driven by Jason Ramos, was "[s]quashed . . . like an accordion" against the front of Defendant's semi-truck. By the time Mr. Delay got to this car, Mr. Ramos was also already deceased. Mr. Delay saw Defendant get out of the cab of his truck, look at the front of his truck, and get back into the truck. Defendant did not check on any of the people in the vehicles that he hit with his truck.

Tennessee Highway Patrol Trooper Gray Gibson was the first officer to arrive on the scene. He was parked north of the accident on I-75, providing protection for the construction zone when a construction worker told him that there was a lot of smoke in the area. Trooper Gibson drove southbound in the northbound lane toward the direction of the smoke. He estimated that it took him thirty seconds to arrive on the scene of what he described as the "worst traffic crash" he had seen in his 20 years on the job. As he surveyed the "chaotic" scene, he saw a "tractor-trailer . . . , up against the barrier wall." Defendant was seated in the passenger seat of his semi-truck. He told Trooper Gibson that he hit his head and did not remember anything. There were "burning cars and just cars everywhere." People were running from a nearby motel with fire extinguishers to assist with the crash scene. Trooper Gibson placed Defendant in the right rear seat of the police car and set about locating witnesses to the crash. Trooper Gibson described Defendant as cooperative in the report he submitted after the crash. Trooper Gibson "did not indicate" that Defendant displayed any signs of intoxication on his report.

Lisa Martin, a phlebotomist, worked as an independent contractor for law enforcement agencies in the Chattanooga area. She routinely travelled to accident sites or hospitals to obtain blood samples for law enforcement agencies after accidents involving fatalities and/or driving under the influence. Her husband, a Chattanooga police officer, woke her up on the night of the accident to inform her that she was needed at an accident scene. On her arrival, she witnessed "[h]orrific devastation." She saw "a vehicle, . . . ,

4

that had slammed into a wall, and there was a fatality in that vehicle." She saw another "vehicle that had been burnt" with "burnt corpses" inside and a "fatality laying [on] the side of the road." She described the scene as gruesome—"you could smell burnt flesh, diesel fuel, almost like a metallic smell" and there was "debris everywhere; car parts, fire extinguishers, bandages, blood, glass, tires."

Mrs. Martin reached Trooper Gibson's vehicle and placed her medical bag on his trunk. She saw Defendant sitting in the trooper's vehicle but did not immediately identify him as the driver because "his demeanor did not match [the] scenario." She introduced herself. Defendant consented to the blood draw so she put on her gloves and prepared to draw Defendant's blood by applying a tourniquet and wiping his arm off with a wipe. Defendant did not appear to be injured. He told Mrs. Martin, "What's done's done, I can't undo it, I don't understand why I'm here, they won't let me go home, can I go home after the blood draw?" Defendant held his breath during the blood draw. Mrs. Martin described this as behavior that indicated someone was trying to pass out intentionally in order to avoid the blood draw. When she completed the blood draw, she wrote Defendant's name on both vials of the blood, did "everything that's required in that TBI [Tennessee Bureau of Investigation] kit, sealed it up and gave it to [Officer Thomas] Seiter."

Officer Seiter was part of the traffic division and motorcycle unit of the Chattanooga Police Department. He and his partner Officer Casey Cleveland responded to a dispatch call about a "multiple vehicle, possible multiple fatalit[y]" crash. They stopped to get the Total Station, "survey equipment for surveying a scene." When he arrived, he encountered Defendant, who "was a little agitated." He asked Defendant if he would give a written statement, and Defendant told Officer Seiter that he could not see without his glasses. Officer Seiter climbed into the cab of Defendant's semi-truck, retrieved Defendant's glasses, and gave them to him. Defendant gave the following written statement: "I seen brake lights tried to stop + couldn't hit brakes + couldn't stop." In a later recorded statement, Defendant explained that he started his delivery on Monday in London, Kentucky. He made that delivery on Wednesday and started to head back home. Defendant explained as he was driving near Chattanooga, he "[s]een the brake lights" and tried to engage his brakes but that they did not work. Defendant claimed that he had some problems with the brakes leaking air but he thought that the issue had been fixed.

Officer Joe Warren, an accident reconstructionist, examined the crash scene. In his opinion, Defendant would have had about one mile of visibility prior to the crash site. There were no observable skid marks prior to the first impact between Defendant's semi-

5

truck and a Toyota Prius. The Prius was travelling at five miles per hour when it was hit by the semi-truck traveling between 78 and 82 miles per hour. Officer Warren opined that the semi-truck knocked the Prius into a Toyota Scion and then into a LeafGuard van. The Prius was moved approximately 200 feet from the initial impact point. Ms. Watts, the driver of the Scion, was ejected from the vehicle and landed about 200 feet north of the collision site despite wearing her seatbelt. A Mazda Tribute ended up sideways against the hood of Defendant's semi-truck and continued to collide with other vehicles while stuck to the front of Defendant's semi-truck. The Mazda was completely crushed and went from being about six feet wide to about two feet wide.

The posted regular speed limit in the area of the crash was 65 for passenger vehicles and 55 for trucks. An inspection of Defendant's semi-truck revealed that the brakes were working properly and that the brake shoes were properly adjusted. The tractor protection valve was not working, but this did not contribute to the crash because the tractor and the trailer were not disconnected from each other. There were no visible skid marks at the scene that indicated the emergency braking system engaged after the air brakes failed.

Autopsies of the six victims, including two children ages nine and eleven, revealed that they died of multiple blunt force injuries caused by a motor vehicle collision. Several of the victims sustained extensive burns in addition to their other injuries.

Chief Brian Hickman of the Collegedale Police Department was certified as a Drug Recognition Expert ("DRE") in the area of drug recognition evaluation over the objection of counsel for Defendant. Chief Hickman explained that a DRE rules out medical issues and alcohol as reasons for impairment and uses certain tests to determine "which drug or drug categories that [the person is] under the influence of." He went through training in order to get certified as a DRE that included two days of school, a test, seven more days of school, a second test, twelve supervised evaluations, and a final knowledge exam. Chief Hickman was required to get recertified every two years.

Chief Hickman explained the "12-step process" for his evaluation of an individual. First, alcohol should be ruled out as the impairment. Second, a "preliminary examination" should be performed by talking to the individual to determine if there are "any medical issues." Chief Hickman explained that the individual may be asked "when did you sleep, when did you eat, have you taken any medications, do you take any drugs, those sort of things. . . ." Then, the individual's eyes are examined for "certain clues." The test advances to the "divided attention tests" before assessing "vital signs" like pulse, blood pressure, and body temperature. The next step is a "dark room exam" of the eyes

under different lighting conditions. The individual should be examined for injection and/or ingestion sites for drugs. Additionally, the individual should be informed of the results of the evaluation and asked "if they confirm anything or add anything to it."

Chief Hickman evaluated Defendant at the Collegedale Police Department. Defendant arrived by patrol car. Defendant was quiet. Defendant's breath test was a "zero zero." The results of the blood test were not available at the time of the evaluation. Defendant informed Chief Hickman that Defendant had a bump on his head but Defendant denied that he needed medical care or an ambulance. Chief Hickman observed the "abrasion" on Defendant's forehead.

Chief Hickman administered four divided-attention tests: the modified Romberg balance test, the walk-and-turn, the finger-to-nose, and the one-leg stand. The modified Romberg balance test requires an individual to "stand with their feet together, their arms down to their side, they slightly tilt their head back, close their eyes, and then they estimate the passage of 30 seconds." At the end of the 30 seconds, the individual tilts their head back to the forward position and tells the test administrator to stop. Chief Hickman looked for any type of swaying, tremors, and the accuracy of the estimation of time. Defendant performed this test, stopping at 27 seconds. During the test, Chief Hickman saw both eyelid and body tremors. Chief Hickman next asked Defendant to perform the walk-and-turn. Chief Hickman demonstrated the proper technique of walking "heel-to-toe" to the end of the line. Defendant was wearing sandals and stepped out of balance during the instruction stage. He took off his sandals, got back into the instruction stage position, and still could not maintain balance. According to Chief Hickman's notes, Defendant raised his arms three times and missed heel-to-toe on the first nine steps. At the turn, Defendant "completely stepped off the line, went to the side, turned around, came back around and then got back in position to continue the test" against the instructions. On the second set of steps, Defendant "raised his arms and missed the heel-to-toe again."

Next, Defendant was asked to perform the one-legged stand. He was instructed to stand on his left leg first, raise his right leg six inches off the ground, keep his arms to his side, keep both of his legs straight, look down at his foot and count "one thousand one, one thousand two," etc. until he was told to stop. Defendant "did not follow . . . instructions, especially on counting." Defendant swayed for balance, used his arms for balance, and put his foot down three times during the test.

Defendant was then asked to perform the finger-to-nose test. Defendant was instructed to "stand with feet together, arms down to [his] side" and to extend his arms

7

"just a little bit, close all fingers [ex]cept [his] index finger, and . . . tilt [his] head back slightly, [and] close [his] eyes." Defendant was then asked to take the tip of his finger and alternatively touch his nose with each finger. Defendant missed the tip of his nose on several tries and used the pad of his finger rather than the tip of his finger. Defendant's pulse rate was measured as high, in the range of 108 to 110 beats per minute. Defendant's blood pressure was also high, at 174/130 compared to a normal reading of 120/70 to 140/90.

As a result of Defendant's performance on the tests and the visual observations, Chief Hickman surmised that Defendant was impaired. Based on his observations, Chief Hickman opined that Defendant was likely under the influence of both a depressant and a stimulant. Chief Hickman acknowledged that the results of Defendant's blood test indicated that Defendant was positive for methamphetamine, a stimulant, but did not indicate the presence of a depressant.

On cross-examination, Chief Hickman admitted that the DRE test was standardized and that the steps needed to be done in the same way and in the same order each time they are administered. He admitted that he failed to interview the arresting officer but acknowledged that Defendant was not in custody at the time he started the test. Additionally, Chief Hickman talked to the officer but noted that "there was nothing that [the officer] gave [him] to put in the report that would be valuable for it." According to Chief Hickman, field studies estimated the accuracy of the DRE test as 50% reliable for predicting stimulants and 33% reliable for predicting depressants. However, he explained that the field studies did not validate the tests with people who had been involved in an accident.

Special Agent Melinda Quinn of the TBI was certified as an expert in the field of forensic toxicology. She tested Defendant's blood. The test reflected that the blood sample was positive for methamphetamine at .08 micrograms per milliliter and amphetamine at less than .05 micrograms per milliliter. She explained that the amphetamine was likely a metabolite[2] of methamphetamine and that the methamphetamine exceeded the therapeutic range. At the levels found in Defendant's blood, methamphetamine caused jitteriness and restlessness, impaired spatial judgment, led to increased risk taking, and made it more difficult to perform "divided attention tasks" like driving a vehicle.

---

[2] A drug metabolite is formed as the result of the body breaking down a drug.

On cross-examination, Special Agent Quinn explained the testing procedure. Part of the procedure involved the use of a solvent named ammonium hydroxide to adjust the pH of a sample. For each blood test, tests are run with the actual sample and with quality control samples. According to Special Agent Quinn, the solvent used by the TBI in running Defendant's test "was contaminated with naphthalene." On the printout from the chromatogram for Defendant's sample there was "naphthalene peak." She explained that the naphthalene was not in "the blood sample, and [she] can show that because it shows up in all of [her] quality control samples. It was in the ammonium hydroxide that we used to help extract the blood." She further explained that naphthalene was "a byproduct that's familiar to most people in terms of mothballs." It also appears in diesel fuel. Special Agent Quinn admitted that she did not make any notes regarding naphthalene in the report about Defendant's sample but that it was "something that we noticed in our laboratory." She further explained that the napthalene "did not prevent [the TBI] from being able to detect drugs that were present in the sample." Special Agent Quinn did not recall making any notes on the report of Defendant's blood sample.

Todd Fortune, a semi-truck driver, testified on behalf of the defense at trial. He witnessed the crash. Mr. Fortune followed Defendant for about five or six miles prior to the accident, going about 64 miles per hour. Mr. Fortune's semi-truck had a governor on it to regulate speed. He acknowledged that the area prior to the wreck was downhill and that Mr. Fortune's semi-truck was probably traveling closer to 70 miles per hour. Mr. Fortune saw Defendant's "brake lights c[o]me on." Mr. Fortune described that Defendant "was bailing out [toward the exit ramp] and he caught that car [sitting in the pie shaped area near the exit ramp] with the right-hand side of his bumper." This was followed by "a violent explosion" where flames shot 25 feet into the air. Defendant then "jerked the wheel back to the left." Mr. Fortune stopped his truck and turned on his flashers.

Dr. Robert Belloto, Jr., testified for the defense as an expert in pharmacology. He criticized the TBI test. He testified that the substances identified in Defendant's blood were likely not methamphetamine or amphetamine. He explained "the way chromatography works" and that the goal is to try to quantitate a substance by looking at the "mass spectrum" to see if you have a match for a drug like methamphetamine. The software used to perform the test gives "what percentage of a match that is, it's based upon some mathematics." In Defendant's sample, "[n]aphthalene was a better match." He explained naphthalene was a component of diesel fuel and diesel exhaust. He further explained that the software "gives you an idea of what's there" in a mass spectrum, and "you now have to interpret that mass spectrum" to determine what organic compounds make the "peaks" on the results. Dr. Belloto explained that if he were performing the test

on Defendant's sample and he saw the spike come up at naphthalene he would "keep digging" and further interpret the results. He interpreted Defendant's results to have "an overlap of other compounds that are coming off approximately the same time, with the same ions." While you "can't separate" every molecule in drug analysis, Dr. Belloto expressed concern that the results did not "all line up . . . [f]or it to be methamphetamine." Dr. Belloto opined that the TBI should have disclosed the contamination and started over with a fresh sample but acknowledged that it would not be entirely unusual to find naphthalene in the blood sample of a truck driver. Dr. Belloto took issue with the TBI's failure to differentiate between L and D methamphetamine. Dr. Belloto admitted that he always testified for the defense and that he did not review the DRE evaluation or law enforcement investigative file prior to his testimony. Dr. Belloto informed the defense that the blood was contaminated with naphthalene. Dr. Belloto did not think the TBI test was reliable because the sample was contaminated, and he did not think the results showed the presence of methamphetamine.

At the conclusion of the jury trial, Defendant was found guilty of all charges. The trial court sentenced Defendant to an effective sentence of 55 years.

*Analysis*

*Brady Violation*

On appeal, Defendant complains that the State committed a *Brady* violation by failing to disclose to the defense prior to trial that Defendant's blood sample was contaminated at the TBI lab with naphthalene. The State disagrees, arguing that Defendant knew that there was naphthalene in the blood sample prior to trial, that knowledge of the naphthalene in the blood sample was not exculpatory, and that the information would not have changed the outcome of the trial had Defendant had the information prior to trial.

According to the record, at least five months before trial, the defense became aware that in addition to the TBI blood testing, a federal agency tested Defendant's blood sample for illegal substances.[3] As a result of this discovery, counsel for Defendant took the deposition of Dr. Russell Lewis, Ph.D., an employee of the Federal Aviation Administration at the Civil Aerospace Medical Institute ("CAMI") in Oklahoma City, Oklahoma via videoconference on September 29, 2017. Dr. Lewis acknowledged he tested Defendant's blood in September of 2015 at the request of the TBI. He utilized an

---

[3] It is not entirely clear from the record why this blood test was ordered.

"immunosassay test" and found both methamphetamine and amphetamine in Defendant's blood. The test result was confirmed by "gas chromatograph with mass spectrometry." The test results confirmed that there were 45 nanograms per milliliter of methamphetamine and 22 nanograms per milliliter of amphetamine in Defendant's blood.[4] His report concluded that the quantity of methamphetamine and amphetamine found in Defendant's blood sample was within therapeutic limits because it fell between the range of 10 nanogram per milliliter and 50 nanogram per milliliter. Neither the deposition of Dr. Lewis nor the test results from CAMI were introduced at trial.

At trial, during the cross-examination of Special Agent Quinn, she revealed that Defendant's blood sample contained naphthalene because the solvent used during the testing process on Defendant's blood was contaminated with naphthalene. Special Agent Quinn insisted that the contamination did not prevent the TBI from running the tests on Defendant's blood sample. Dr. Belloto, the defense expert, testified that the correct way to deal with a contaminant in a blood sample was to "start over" with a "fresh sample." Dr. Belloto explained there "was nothing in the notes" from the TBI to disclose the contamination. In fact, he "was the one who actually informed [the defense] what it was" when reviewing the test results from the TBI. Dr. Belloto testified that he did not initially become concerned that the blood sample was contaminated because "it's not unexpected that [naphthalene] might be there" because Defendant was a truck driver and could have been inhaling the chemical.

At the close of the State's proof, counsel for Defendant argued to the trial court that a *Brady* violation had been committed by the State. Counsel for Defendant agreed that they received the TBI blood sample package, including raw data and computer files, as part of discovery but insisted that there was no mention of a contaminant in the blood sample. Counsel for Defendant argued that the information regarding the contaminant was exculpatory and, had the defense known about it prior to trial, they may have changed their strategy by moving to admit the CAMI test and/or the deposition of Dr. Lewis as proof at trial that levels of methamphetamine and amphetamine were within therapeutic levels in Defendant's blood. The trial court asked counsel for Defendant how they knew "to ask about [the contamination on cross-examination]" of Special Agent Quinn. Counsel for Defendant admitted that they had researched the matter and were aware that contamination could occur but claimed that they were not aware of actual contamination in Defendant's case. Defense counsel asked the trial court to strike the lab test and the testimony of Special Agent Quinn and also requested the trial court give a curative instruction to the jury. The trial court recalled that counsel for Defendant

---

[4] This converts to .05 and .02 micrograms, respectively.

11

extensively cross-examined Special Agent Quinn, who explained the source of the contamination and testified that the contamination of the sample did not change her conclusion that methamphetamine was present in Defendant's blood. The trial court concluded that there was nothing exculpatory about the evidence and that the "defense went into it thoroughly."

Counsel for Defendant renewed the issue at a hearing on the motion for new trial and a motion for specific discovery filed after the jury trial. In the motion for specific discovery, counsel for Defendant sought all correspondence between the TBI and the Hamilton County District Attorney's Office with regard to Defendant's blood sample, test, contamination of the blood sample, all documents concerning the contaminated ammonium hydroxide and a copy of the TBI quality assurance protocol. At the hearing on the motion, counsel for Defendant agreed that they received raw testing data in materials from the State prior to trial and that the defense expert Dr. Belloto examined the raw data prior to trial but that the defense was not aware of the contamination until cross-examination of Special Agent Quinn.

At the hearing on the motion for new trial, counsel for Defendant submitted affidavits in which counsel explained that they learned of the CAMI test just prior to trial and hired Dr. Belloto to reexamine the test results. Dr. Belloto's assessment that the lab results were a better match for naphthalene than methamphetamine led counsel to believe they could demonstrate that the TBI result showed naphthalene rather than methamphetamine at trial. Further, trial counsel explained that because they were unaware that the sample was contaminated with naphthalene, they had no reason to use the CAMI test results at trial even though the CAMI test showed methamphetamine was within therapeutic levels. Counsel claimed that had he known of the contamination prior to trial he would have utilized both the CAMI test results and the deposition testimony of Dr. Lewis during trial to discredit the TBI test results.

The trial court concluded that proof of the blood sample's contamination was not exculpatory. The trial court again determined that the defense thoroughly cross-examined Agent Quinn and that her testimony was credible. The trial court further noted that the defense expert opined that Defendant did not have methamphetamine in his blood at all. As a result, the trial court determined that there was no *Brady* violation. Defendant insists on appeal that the trial court's conclusion was incorrect.

"Every criminal defendant is guaranteed the right to a fair trial under the Due Process Clause of the Fourteenth Amendment to the United States Constitution and the "Law of the Land" Clause of Article I, section 8 of the Tennessee Constitution." *Johnson*

12

*v. State*, 38 S.W.3d 52, 55 (Tenn. 2001). In the landmark case of *Brady v. Maryland*, the United States Supreme Court held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87. The duty to disclose extends to all "favorable information" regardless of whether the evidence is admissible at trial. *Johnson*, 38 S.W.3d at 56. Additionally, "the prosecutor is responsible for 'any favorable evidence known to the others acting on the government's behalf in the case, including the police.'" *Strickler v. Greene*, 527 U.S. 263, 275 n.12 (1999) (quoting *Kyles v. Whitley*, 514 U.S. 419, 437 (1995)). However, the State is not required to disclose evidence that the accused already possesses or is otherwise able to obtain. *State v. Marshall*, 845 S.W.2d 228, 233 (Tenn. Crim. App. 1992).

There are four prerequisites a defendant must demonstrate in order to establish a due process violation under *Brady*: (1) the defendant requested the information (unless the evidence is obviously exculpatory, in which case the State is required to disclose the evidence); (2) the State suppressed the information; (3) the information was favorable to the accused; and (4) the information was material. *State v. Edgin*, 902 S.W.2d 387, 389 (Tenn. 1995). Moreover, the defendant has the burden of proving a constitutional violation by a preponderance of the evidence. *State v. Spurlock*, 874 S.W.2d 602, 610 (Tenn. Crim. App. 1993). The key to proving a constitutional violation is to show that the omission is of such significance as to deny the defendant the right to a fair trial. *United States v. Agurs*, 427 U.S. 97, 108 (1976). Whether a petitioner is entitled to a new trial based upon a Brady violation "presents a mixed question of law and fact." *Cauthern v. State*, 145 S.W.3d 571, 599 (Tenn. Crim. App. 2004).

> The lower court's findings of fact, such as whether the defendant requested the information or whether the [S]tate withheld the information, are reviewed on appeal de novo with a presumption that the findings are correct unless the evidence preponderates otherwise. The lower court's conclusions of law, however, such as whether the information was favorable or material, are reviewed under a purely de novo standard with no presumption of correctness.

*Id.* We shall discuss each element in turn.

*1. Request for the Evidence*

13

First, we must determine whether trial counsel requested the evidence or whether it was obviously exculpatory, thereby triggering the State's duty to disclose it. We decline to determine that the evidence was obviously exculpatory, necessitating the State's disclosure of the evidence because the presence of napthlalene in Defendant's blood does not negate the finding of methamphetamine above therapeutic levels in Defendant's blood. Special Agent Quinn and defense expert Dr. Belloto both testified that Defendant's blood sample contained methamphetamine in a quantity that was not therapeutic. Defendant requested and received all information related to the blood test, including the raw data. There is no question that Defendant received those results. The existence of naphthalene in the blood sample does not mitigate the fact that Defendant's blood contained methamphetamine. Thus, the evidence does not preponderate against the trial court's determination that the evidence was not exculpatory and/or that counsel made a request for the evidence.

### 2. Suppression of the Evidence

Next, we must determine whether the State suppressed the evidence. The State is not required to "disclose information that the accused already possesses or is able to obtain." *State v. Marshall*, 845 S.W.2d 228, 233 (Tenn. Crim. App. 1992). Here, the record reflects that Defendant received the TBI test results and raw data prior to trial. Moreover, Defendant knew about the CAMI test and deposed Dr. Lewis prior to trial and chose not to introduce this proof at trial. Defense expert Dr. Belloto testified that he informed the defense of the presence of naphthalene in the blood sample while reviewing the materials from the TBI prior to trial. In other words, Defendant knew about the naphthalene in Defendant's blood sample prior to trial. Counsel for Defendant questioned Special Agent Quinn about the contamination on cross-examination. While Defendant arguably did not definitively learn of the source of the contamination of the sample until the testimony of Special Agent Quinn, Defendant nonetheless knew that the blood sample contained naphthalene. Even if the source of the contamination could be somehow be construed as evidence that the State suppressed, this Court has previously stated that "[i]f previously undisclosed evidence is disclosed during trial, then no [*Brady*] violation occurs unless prejudice results from the delayed disclosure." *State v. Jim Inman*, No. 03C01-9201-CR-00020, 1993 WL 483321, at *9 (Tenn. Crim. App. Nov. 23, 1993) (citing *United States v. Word*, 806 F.2d 658, 665 (6th Cir.1986)), *perm. app. denied* (Tenn. Apr. 4, 1994). The trial court determined that Defendant "knew about it sufficiently in advance to appropriately prepare for [trial]." The evidence does not preponderate against the trial court's conclusion.

### 3. Favorability of the Evidence

14

"Evidence 'favorable to an accused' includes evidence deemed to be exculpatory in nature and evidence that could be used to impeach the state's witnesses." *Johnson*, 38 S.W.3d at 55-56. Favorable evidence includes evidence that "provides some significant aid to the defendant's case, whether it furnishes corroboration of the defendant's story, calls into question a material, although not indispensable, element of the prosecution's version of events, or challenges the credibility of a key prosecution witness." *Id.* at 56-57. Favorable evidence also includes "'information that would have enabled defense counsel to conduct further and possibly fruitful investigation.'" *Id.* at 56 (quoting *Marshall*, 845 S.W.2d at 233).

The trial court determined that the information was not obviously exculpatory. We agree. Thus, it could only be considered favorable if it challenges the credibility of a State's witness or piece of evidence. The trial court determined that Defendant "did a good job in cross-examining" Special Agent Quinn about the effect of the contaminant on the blood test. Indeed, Special Agent Quinn readily admitted that her testing method did not introduce the contaminant into the blood sample and that the naphthalene did not compromise the efficacy of the test. We acknowledge that Dr. Belloto's testimony contradicted Special Agent Quinn's. In particular, he questioned the validity of the test on the basis that the sample was contaminated. In this case, Defendant actually used the evidence to question the credibility of Special Agent Quinn on cross-examination and through the introduction of Dr. Belloto's testimony. The jury heard all this and rendered a verdict that accredited the testimony of Special Agent Quinn and her findings. This was certainly the jury's prerogative. In our view, the evidence was not favorable to the defense in the sense required by *Brady*.

*4. Materiality of the Evidence*

Evidence is considered material "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the results of the proceeding would have been different." *Bagley*, 473 U.S. at 682. The defendant does not need to prove that disclosure of the evidence would have resulted in an acquittal. *See Kyles*, 514 U.S. at 434. "Nor is the test of materiality equivalent to that of evidentiary sufficiency, such that we may affirm a conviction or sentence when, 'after discounting the inculpatory evidence in light of the undisclosed evidence, the remaining evidence is sufficient to support the jury's conclusions.'" *Johnson*, 38 S.W.3d at 58 (quoting *Strickler*, 527 U.S. at 275). Rather, the question is whether in the absence of the evidence, the defendant received a fair trial, "understood as a trial resulting in a verdict worthy of confidence." *Kyles*, 514 U.S. at 434. The defendant must show that "the favorable evidence could reasonably be

taken to put the whole case in such a different light as to undermine confidence in the verdict." *Irick v. State*, 973 S.W.2d 643, 657 (Tenn. Crim. App. 1998) (citing *Edgin*, 902 S.W.2d at 390). A reviewing court should evaluate the evidence "'in light of the totality of the circumstances and with an awareness of the difficulty of reconstructing in a post-trial proceeding the course that the defense and the trial would have taken had the defense' been made aware of the favorable information." *Spurlock*, 874 S.W.2d at 619 (quoting *Bagley*, 473 U.S. at 683). In other words, "the materiality of the suppressed evidence must be evaluated within the context of the entire record." *Jordan v. State*, 343 S.W.3d 84, 97 (Tenn. Crim. App. 2011).

The trial court found that nothing "else could have been done to change the outcome of the trial if [the defense] had known about this at any particular time." The trial court continued, determining Defendant "knew about it sufficiently in advance to appropriately prepare for that information." We agree. Even if the knowledge of the blood sample contamination would have caused the jury to completely discount the test results, it would not have cast "the whole case in such a different light as to undermine confidence in the verdict." *Irick*, 973 S.W.2d at 657. There was other evidence introduced at trial to establish Defendant's intoxication. Defendant has not established all four prerequisites to establish a *Brady* violation. Consequently, he is not entitled to relief on this issue.

*Trial Court Erred in Admitting DRE Expert*

Defendant next complains that the trial court abused its discretion by admitting Chief Hickman as a DRE expert "because his knowledge and procedures failed to satisfy *McDaniels*[*v. CSX Transp., Inc.*, 955 S.W.2d 257, 265 (Tenn. 1997)], factors." Specifically, Defendant complains that Chief Hickman "misapplied the test and its methods to an individual who had been involved in an auto accident mere hours before the test was administered." Moreover, Defendant complains that the DRE testing and results "lacked trustworthiness and w[ere] not reliable." The State argues that the trial court did not abuse its discretion.

At a pre-trial hearing, the trial court heard testimony from Chief Hickman about his DRE training and qualifications. Chief Hickman explained that he attended a two-day pre-school and seven-day post-school as well as taking a series of twelve evaluations and a knowledge exam prior to gaining certification as a DRE. He was required to recertify every two years. Chief Hickman has been certified as a DRE since 2004 and kept logs of every evaluation he has performed. Chief Hickman explained the twelve steps involved in the DRE evaluation and that the steps should be performed in the same order and

16

manner each time. Chief Hickman recalled learning about field validation studies that were conducted on almost 200 people who were arrested in Los Angeles after the development of DRE tests. During these tests, subjects were given certain drugs or placebos and tests were then performed on each subject. He explained that the field studies were 50% accurate regarding the presence of depressants and 33% accurate regarding the presence of stimulants. The field studies correctly predicted high doses of d-amphetamine 98% of the time but low doses only 17.5% of the time. Chief Hickman was not aware of any tests validating DRE testing with persons involved in automobile crashes.

After hearing the testimony, the trial court denied the motion to suppress the DRE testimony and set forth the twelve-step test for DRE testing:

1. obtain a breath alcohol test to rule out alcohol;
2. interview the arresting officer;
3. question the suspect about history, including medication and drug use
4. examine the suspect's eyes, including light sensitivity and horizontal-gaze nystagmus;
5. administer a divided-attention test;
6. take vital signs
7. check muscle tone of suspect
8. check for injection sites indicating drug use
9. talk to the suspect
10. ask about result
11. render an opinion on impairment
12. get a toxicology screen

The trial court noted the accuracy of the field tests and the methods and data used during the development of the field tests. He described the field studies as "appropriate and exhaustive" and commented that Johns Hopkins University followed the development of the DRE field test with "extensive studies." The trial court acknowledged that the field studies did not involve subjects who were in auto accidents but noted that Defendant was not injured in the accident. The trial court determined that Chief Hickman followed the DRE procedure and that his training, education, background, certification, and experience all made him qualified to testify as an expert. Further, the trial court concluded that the evidence would substantially assist the trier of fact as required by Tennessee Rule of Evidence 702 and 703 and should be admitted at trial as expert testimony. At trial, Defendant again objected to the introduction of the DRE testimony.

The admissibility of expert testimony is governed by Rule 702 of the Tennessee Rules of Evidence. "If scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise." Tenn. R. Evid. 702. Our supreme court has further defined the role of the trial court in assessing the propriety of expert testimony:

> Trial courts act as gatekeepers when it comes to the admissibility of expert testimony. Their role is to ensure that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field. A court must assure itself that the expert's opinions are based on relevant scientific methods, processes, and data, and not upon an expert's mere speculation. The court's reliability analysis has four general inter-related components: (1) qualifications assessment, (2) analytical cohesion, (3) methodological reliability, and (4) foundational reliability.

*State v. Scott*, 275 S.W.3d 395, 401-02 (Tenn. 2009) (internal citations and quotation marks omitted).

Rule 703 of the Tennessee Rules of Evidence provides that:

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence. The court shall disallow testimony in the form of an opinion or inference if the underlying facts or data indicate lack of trustworthiness.

Trial courts are vested with broad discretion in resolving questions regarding the admissibility of expert testimony. *State v. Copeland*, 226 S.W.3d 287, 301 (Tenn. 2007). On appellate review, we will not disturb a trial court's decision regarding the admission or exclusion of expert testimony absent an abuse of discretion. *Scott*, 275 S.W.3d at 404. A trial court abuses its discretion when it applies incorrect legal standards, reaches an illogical conclusion, bases its decision on a clearly erroneous assessment of the evidence, or employs reasoning that causes an injustice to the complaining party. *State v. Ruiz*, 204

S.W.3d 772, 778 (Tenn. 2006) (citing *Howell v. State*, 185 S.W.3d 319, 337 (Tenn. 2006)). At trial, the burden rests on the party proffering the expert witness to establish that the evidence "rests upon 'good grounds.'" *Scott*, 275 S.W.3d at 404.

Defendant claims that this is a case of first impression because "no case law exists in Tennessee regarding the Rule 702 admissibility of DRE evidence," and therefore insists that the *McDaniels* factors must be considered. In *McDaniel,* the Tennessee Supreme Court identified five nonexclusive factors courts are to consider in assessing the reliability of expert testimony:

> (1) whether scientific evidence has been tested and the methodology with which it has been tested; (2) whether the evidence has been subjected to peer review or publication; (3) whether the potential rate of error is known; (4) whether . . . the evidence is generally accepted in the scientific community; and (5) whether the expert's research in the field has been conducted independent of litigation.

*McDaniel*, 955 S.W.2d at 265. "These factors are not requirements for admissibility but may be considered by the trial judge when weighing the reliability of the expert testimony and forensic evidence." *State v. Davidson*, 509 S.W.3d 156, 208 (Tenn. 2016). A court "must assure itself that the [expert's] opinions are based on relevant scientific methods, processes, and data, and not upon an expert's mere speculation." *Id.* (quoting *McDaniel*, 955 S.W.2d at 265). A rigid application of the *McDaniel* factors is not required, their application in assessing reliability depends upon several considerations including the nature of the issue, the witness's particular expertise, and the subject of the expert's testimony. *Id.* (citing *Brown v. Crown Equip. Corp.*, 181 S.W.3d 268, 277 (Tenn. 2005) (citing *State v. Stevens*, 78 S.W.3d 817, 833 (Tenn. 2002); *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999)); *Scott*, 275 S.W.3d at 402).

We were unable to locate any cases in this State examining the admissibility of DRE testimony as expert testimony. We were, however, able to locate two cases from this Court that reference DRE testimony. *See, e.g. State v. Thomas Huey Liles, Jr.*, No. E2018-00384-CCA-R3-CD, 2019 WL 494774, at *3 (Tenn. Crim. App. Feb. 8, 2019) (admitting testimony of officer as a drug recognition expert at trial), *no perm. app. filed*; *State v. Thomas J. Privett*, No. M2017-00539-CCA-R3-CD, 2018 WL 557924, at * (Tenn. Crim. App. Nov. 14, 2017) (admitting testimony of drug recognition expert at a sentencing hearing to testify about driving while impaired by methamphetamine), *no perm. app. filed*. In addition, many other courts have considered this issue and concluded that testimony based on the DRE protocol is admissible as evidence. *See, e.g., Mace v.*

19

*State*, 944 S.W.2d 839 (Ark. 1997); *State v. Daly*, 775 N.W.2d 47, 58-59 (Neb. 2009) (citing *U.S. v. Everett*, 972 F. Supp, 1313 (D. Nev. 1997)); *Williams v. State*, 710 So. 2d 24 (Fla. App. 1998); *State v. Kanamu*, 112 P.3d 754 (Haw. App. 2005); *State v. Klawitter*, 518 N.W.2d 577 (Minn. 1994); *State v. Aleman*, 194 P.3d 110 (N.M. App. 2008); *People v. Hazard*, No. 341544, 2019 WL 131179, at *7 (Mich. Ct. App. Mar. 26, 2019); *State v. Sampson*, 6 P.3d 543 (Or. App. 2000); *Wooten v. State*, 267 S.W.3d 289 (Tex. App. 2008); *State v. Baity*, 991 P.2d 1151 (Wash. 2000); *State v. Chitwood*, 879 N.W.2d 786, 799 (Wis. Ct. App. 2016).

In this case, the trial court held a hearing on the proposed expert testimony. The trial court complied with both Tennessee Rule of Evidence 702 and 703 and concluded that the testimony was admissible. While not explicitly naming the *McDaniel* factors, the trial court aptly considered the development of the test and its reliability when determining whether to admit the testimony. The trial court noted the field tests, testing the methodology; the review of the methodology by Johns Hopkins, the rate of error, the number of experts certified in the State of Tennessee. Finally, the trial court put all its findings and conclusions in a well-developed, well-reasoned, six-page written order. In our assessment, the trial court did not abuse its discretion. "[T]he weight to be given [expert testimony] is a question for the jury under careful instruction of the trial judge." *Mullendore v. State*, 191 S.W.2d 149, 152 (Tenn. 1945); *see also State v. Sparks*, 891 S.W.2d 607, 616 (Tenn. 1995); *State v. Anderson*, 880 S.W.2d 720, 732 (Tenn. Crim. App. 1994). Defendant is not entitled to relief on this issue.

## *Sufficiency of the Evidence*

Defendant next argues that the evidence was insufficient to convict Defendant of "being intoxicated beyond a reasonable doubt." Specifically, Defendant insists that only Chief Hickman and Special Agent Quinn gave testimony about Defendant's intoxication at trial. Defendant questions the validity of Chief Hickman's DRE evaluation and the blood test performed by Special Agent Quinn. The State, on the other hand, argues that the proof, in a light most favorable to the State, revealed that Defendant's blood test was positive for both methamphetamine and amphetamine and that the DRE evaluation revealed Defendant was under the influence of a stimulant.

When a defendant challenges the sufficiency of the evidence, this Court is obliged to review that claim according to certain well-settled principles. A guilty verdict removes the presumption of innocence and replaces it with a presumption of guilt. *State v. Evans*, 838 S.W.2d 185, 191 (Tenn. 1992). The burden is then shifted to the defendant on appeal to demonstrate why the evidence is insufficient to support the conviction. *State v.*

*Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). The relevant question the reviewing court must answer is whether any rational trier of fact could have found the accused guilty of every element of the offense beyond a reasonable doubt. *See* Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). On appeal, "the State is entitled to the strongest legitimate view of the evidence and to all reasonable and legitimate inferences that may be drawn therefrom." *State v. Elkins*, 102 S.W.3d 578, 581 (Tenn. 2003). As such, this Court is precluded from re-weighing or reconsidering the evidence when evaluating the convicting proof. *State v. Morgan*, 929 S.W.2d 380, 383 (Tenn. Crim. App. 1996); *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Moreover, we may not substitute our own "inferences for those drawn by the trier of fact from circumstantial evidence." *Matthews*, 805 S.W.2d at 779. Further, questions concerning the credibility of the witnesses and the weight and value to be given to evidence, as well as all factual issues raised by such evidence, are resolved by the trier of fact and not the appellate courts. *State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

Vehicular homicide is the reckless killing of another by the operation of a motor vehicle, as the proximate result of the driver's intoxication. T.C.A. § 39-13-213(a)(2). Intoxication occurs when a driver is under the influence of any intoxicant or controlled substance that impairs his ability to safely operate a motor vehicle by depriving him of the clearness of mind and control of himself that he would otherwise possess. T.C.A. § 55-10-401.

Here, Special Agent Quinn testified that Defendant's blood test was positive for both methamphetamine and amphetamine and the methamphetamine was in an amount that was higher than therapeutic. In Special Agent Quinn's expert opinion, the amount of methamphetamine and amphetamine in Defendant's blood would result in restlessness, impaired spatial judgment, increased risk taking, and making it difficult to perform divided-attention tasks, like driving. Chief Hickman testified that he evaluated Defendant using the DRE protocol and determined that Defendant was impaired by a stimulant. Chief Hickman explained that Defendant's poor performance on several of the tasks and the entirety of the DRE evaluation led him to believe that Defendant was unsafely operating a motor vehicle while under the influence of an intoxicant. There was also testimony that Defendant failed to even attempt to stop prior to the crash. Defendant himself admitted that he "couldn't, hit brakes and couldn't stop." Defendant's main complaint on appeal goes to the weight and credibility of the evidence. These tasks are

21

for the jury to determine. The evidence was sufficient to establish intoxication and, consequently, vehicular homicide. Defendant is not entitled to relief on this issue.[5]

*Sentencing*

Lastly, Defendant complains that the trial court erred by ordering consecutive sentencing. Specifically, Defendant takes issue with the fact that the trial court deemed him a "dangerous offender" for sentencing purposes, considering only the number of people he killed rather than the danger he posed to those other people on the road that day. The State insists that the trial court properly considered the factors set forth in *State v. Wilkerson*, 905 S.W.2d 933, 935 (Tenn. 1995).

Where a defendant is convicted of one or more offenses, the trial court has discretion to decide whether the sentences shall be served concurrently or consecutively. T.C.A. § 40-35-115(a). The Tennessee Supreme Court has held, "the abuse of discretion standard, accompanied by a presumption of reasonableness, applies to consecutive sentencing determinations." *State v. Pollard*, 432 S.W.3d 851, 860 (Tenn. 2013). A trial court may order multiple offenses to be served consecutively if it finds by a preponderance of the evidence that a defendant fits into at least one of the seven categories in Tennessee Code Annotated section 40-35-115(b). This Court must give "deference to the trial court's exercise of its discretionary authority to impose consecutive sentences if it has provided reasons on the record establishing at least one of the seven grounds listed in Tennessee Code Annotated section 40-35-115(b)." *Pollard*, 432 S.W.3d at 861. An order of consecutive sentencing must be "justly deserved in relation to the seriousness of the offense." T.C.A. § 40-35-102(1); *see State v. Imfeld*, 70 S.W.3d 698, 708 (Tenn. 2002). In addition, the length of a consecutive sentence must be "no greater than that deserved for the offense committed." T.C.A. § 40-35-103(2); *see Imfeld*, 70 S.W.3d at 708. When imposing consecutive sentences pursuant to the dangerous offender classification, the trial court must conclude that the proof establishes that the aggregate sentence is "reasonably related to the severity of the offenses" and "necessary in order to protect the public from further criminal acts." *Id.* (quoting *Wilkerson*, 905 S.W.2d at 938).

At the sentencing hearing, the trial court thoroughly discussed the Sentencing Act prior to pronouncing Defendant's sentence. The trial court explicitly went through the *Wilkerson* factors on the record. The trial court determined Defendant's behavior indicated little or no regard for human life and no hesitation for committing a crime when

---

[5] Defendant does not challenge the sufficiency of his remaining convictions.

22

the risk to human life was high. The trial court reviewed the facts from trial that showed Defendant plowed into nearly standstill traffic at around 80 miles per hour, killing six people and wounding several others. The trial court noted that Defendant's reckless disregard for the lives of others could have led to even more deaths, because there were many cars stopped in construction traffic that evening. The trial court determined two of the consecutive sentencing factors pertained to Defendant: (1) that the sentence was necessary to protect the public from further serious criminal conduct; and (2) that it reasonably related to the severity of the offenses committed. In our assessment, the trial court's determinations are supported by the record, and it did not err in sentencing Defendant to an effective sentence of 55 years at thirty percent.

*Conclusion*

For the foregoing reasons, the judgments of the trial court are affirmed.

_____
TIMOTHY L. EASTER, JUDGE